UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__12/3/2021__
```

---------------------------------------------------------------------X
:
BERNARD WILKERSON,                                        :
                                                         :
                              Plaintiff,                  :
                                                         :                    19-cv-9340 (LJL)
            -v-                                           :
                                                         :               OPINION AND ORDER
METROPOLITAN TRANSPORTATION                              :
AUTHORITY, et al.,                                       :
                                                         :
                              Defendants.                 :
                                                         :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

　　Defendants Metropolitan Transportation Authority ("MTA"), New York City Transit

Authority ("Transit"), and Ricardo John ("John" and collectively "Defendants") move, pursuant

to Federal Rule of Civil Procedure 56, for summary judgment dismissing the claim of plaintiff

Bernard Wilkerson ("Plaintiff" or "Wilkerson").

　　For the following reasons, the motion for summary judgment is granted in part and

denied in part.

## BACKGROUND

　　The following facts are undisputed for purposes of this motion except whether otherwise

indicated.

## I.　　Plaintiff's Employment at Transit

　　Wilkerson is an observant Muslim.  Dkt. No. 40 ¶ 10.  He wears a beard as a tenet of his

faith.  *Id.*  He has been employed by Transit since March 2001 when he was hired as a conductor.

*Id.* ¶ 1.  He attained "permanent" status as a conductor following his completion of a one-year

probationary period.  *Id.* ¶ 2.  He was one of over 100 employees beginning in the role of

conductor at Transit. *Id.* ¶ 16. At the time he completed his probationary period and became a permanent conductor, there were over 500 conductors working for Transit. *Id.* ¶ 17.

Pursuant to a collective bargaining agreement between Transit and Local 100 of the Transport Workers Union of America, of which conductors at Transit are members, conductors "pick," or select, their job assignments, including reporting location, shifts, and regular days off. *Id.* ¶ 4. As a permanent conductor, Wilkerson was able to pick an assignment available to employees with the conductor title. Dkt. No. 47 ¶ 6. Conductors may pick one of four job assignments—road service coordinator, platform conductor, hand switching, and construction flagging—as well as inter-office positions such as mail delivery. Dkt. No. 45 ¶ 5.

Conductors who take on the role of construction flaggers support capital construction projects performed by outside contractors. Dkt. No. 43 ¶ 7. Their role is to provide a safe environment for those contractors working the New York City Transit system. Dkt. No. 47 ¶ 16. Specifically, after determining where the contractors would be placed, construction flaggers position lights and portable trips to ensure that oncoming train traffic becomes aware of the contractors and takes the necessary precautions to avoid injuring anyone on the roadway. *Id.* Construction flaggers are able to receive additional overtime and have the ability to advance to "lead construction flagger." *Id.* ¶ 17.

An average of 55 capital construction projects are in progress during the course of any given week, a large portion of which take place in tunnels and underground stations. Dkt. No. 43 ¶ 9. A list of capital construction projects, together with their locations and staffing needs for each shift, is posted weekly. *Id.* ¶ 11. Construction flaggers, in order of their seniority, select from that weekly list their "preferred" location, shifts, and regular days off. *Id.* ¶ 11. There is no guarantee that construction flaggers will be granted their preferred locations, shifts, and regular

days off.  Since a construction project may be affected on any given day by delays in obtaining

necessary materials, equipment failure, inadequate coordination of the work among

subcontractors and other factors, flaggers may be assigned by management to locations and shifts

without regard to their weekly picks.  *Id.* ¶ 12.

Plaintiff was one of about 700 construction flaggers employed with Transit.  Dkt. No. 47

¶ 15.  He initially picked the role of construction flagger within the Rapid Transit Operations

work program in or around 2003.  *Id.* ¶¶ 7, 14.  The role of construction flagger was appealing to

Plaintiff, as construction flaggers receive higher compensation than other conductors, most

notably hazard pay, and are able to work additional days during the week, receive overtime, and

have the ability to advance to "lead construction flagger."  *Id.* ¶ 17.

## II.     The Respirator Requirement

When Plaintiff began working as a construction flagger in 2003, there was no

requirement that construction flaggers wear a respirator.  Dkt. No. 47 ¶ 34.  However, some of

the work of construction flaggers—the parties dispute whether this is true for the majority of the

work—requires them to be in proximity to trains powered by diesel-engine locomotives.  Dkt.

No. 43 ¶ 13; Dkt. No. 47 ¶ 19.  Some diesel-engine locomotives—specifically, the R156 engines

that MTA purchased in 2014—emit exhaust containing toxic gases.  Dkt. No. 43 ¶ 14; Dkt. No.

30 ¶ 6.  In 2014, Transit's Office of System Safety conducted assessments to quantify workers'

exposure in a subway environment to the exhaust emitted by these engines.  Dkt. No. 40 ¶ 8.

The Office of System Safety determined that employees performing work in proximity to the

R156 diesel-engine locomotives were "exposed to [nitrogen dioxide] in excess of the New York

State Department of Labor (NYS DOL) Short Term Exposure Limit (STEL) of 1 part per million

(PPM)."  *Id.* ¶ 9.  The Office of System Safety issued a report stating that the overexposure to

nitrogen dioxide required that affected workers "must utilize respiratory protection" pursuant to

Transit's Respiratory Protection Program.  Dkt. No. 43 ¶ 17.  The report mandated use of a specific respirator and cartridge:

> All New York City Transit personnel assigned to work in underwater tubes involving the use of R156 Diesel Locomotives must be included in the NYC Transit's Respiratory Protection Program.  Survivair half-face negative pressure air purifying respirators with S-Series combination P100/multi-contaminant cartridges are required for use.

*Id.*

In 2016, 2017, and 2018, Transit issued advisories instructing employees that "[a] tight-fitted negative pressure respirator is the only respirator that is approved for diesel exhaust protection" and that use of the respirator requires the employees to be clean-shaven because "facial hair compromises the seal of the respirator to the face."  *Id.* ¶ 20 (citing Dkt. No. 30 ¶¶ 9–11).  However, Plaintiff did not see and was not informed of the advisories or of a directive indicating that all employees must be clean shaven.  *Id.*

Defendants are not aware whether there exists a nitrogen dioxide absorbent cartridge for use with a PowerAir-Purifying Respirator ("PAPR")—which could be used with facial hair—nor does Plaintiff identify that such a cartridge exists.  *Id.* ¶ 19.  When Defendants did engage with manufacturers—after the events about which Plaintiff brings this suit—to see if there were alternatives to the specific respirator being used, they did not get a response.  *Id.*

## III.    Plaintiff's Respirator Accommodation from 2013–2018

In 2013, the first year in which Plaintiff attended a respirator class, it was not yet a requirement for construction flaggers to wear a respirator and respirators were provided on a voluntary basis.  Dkt. No. 47 ¶¶ 39–40.  At the respirator class, Plaintiff was informed by the instructor that he needed a respirator, and he learned that the beard he wears as a tenet of his faith may interfere with his ability to use a respirator.  *Id.* ¶ 40.  The instructor informed Plaintiff that he would be able to use an alternative respirator called a PowerAir-Purifying Respirator

4

("PAPR") to accommodate his facial hair and that he would not need to be clean-shaven for the PAPR. *Id.* ¶¶ 42–43. Plaintiff was issued a full facemask and was told that he would be receiving a PAPR in the future. *Id.* ¶ 44.

Despite receiving this accommodation, Plaintiff continued to attend the respirator class every year. Dkt. No. 44 ¶ 45. After attending the respirator class every year, Plaintiff would receive documentation indicating he had completed the training program and that he required a PAPR to return to work. Dkt. No. 47 ¶ 45. Plaintiff was instructed to give the documentation to his department supervisor, and he did so every year; every year he was notified that he would receive a PAPR, but he never received one. *Id.* ¶¶ 45–46.

At Transit, the standard practice for requesting a religious accommodation is that the employee requesting the accommodation is directed to fill out documentation accompanied by any supporting documentation and provide it to their supervisor. *Id.* ¶ 23. The request is then submitted to labor relations. *Id.* To obtain such an accommodation, an employee is required to submit a statement on what the accommodation requires, what aspect of their religion needs to be accommodated, and what part of their duties needs to be accommodated; typically, this is documentation from an employee's religious institution. *Id.* ¶ 34. Transit does not require recertification of a request for reasonable accommodation based on religion. *Id.* ¶ 25. However, if an accommodation has ended, an employee will be notified verbally and in writing. *Id.*

The parties dispute whether Plaintiff ever officially received such a religious accommodation. It is undisputed that management requested Plaintiff to submit a letter from his Imam confirming his religious beliefs and that he provided such a letter to his supervisor and was informed that the letter would be provided to Defendants' labor relations department. *Id.* ¶¶ 27–29. The record reflects that Plaintiff provided such letters at least in 2016 and 2018. Dkt. No.

42, Ex. 5.  The 2016 letter confirms that Plaintiff is a practicing Muslim, and requests that

Transit "continue to allow Mr. Wilkerson to attend service to fulfill his religious obligations and

be afford [sic] all the other rights and privileges necessary to enable him to practice his faith."

*Id.*  The 2018 letter reiterates the same request, and adds:  "It should also be known that Muslim

men wear beards as an aspect of the practice of the religion and in an effort to follow the Prophet

of Islam."  *Id.*  The record also reflects that in at least 2013, 2016, and 2017, Plaintiff attended

the Respiratory Protection Program respirator training class, and the instructors signed forms

indicating that he was trained; the 2013 form indicates that he received a full-face mask; the

2016 form indicates that he was not fit-tested because of his beard; and the 2017 form indicates

that he needs a loose-fitting PAPR.  Dkt. No. 42, Ex. 8.  Defendants do not dispute that this in

fact occurred every year from 2013 until 2018.  Dkt. No. 47 ¶¶ 45–46.  However, Defendants

state that "[t]here is no record of Wilkerson having received a religious accommodation in 2013

or at any time thereafter."  *Id.* ¶ 32 (citing Dkt. No. 42, Ex. 4 ("Franceschini Dep.") at 41–43).

David Franceschini, the Senior Director of Collective Bargaining in the Office of Labor

Relations, testified that no request for accommodation by Plaintiff was made through him during

the 2013–2018 period, and that he was not aware of any such accommodation.  Franceschini

Dep. at 43.  When asked if "religious accommodations [could] be granted to an employee outside

of [his] office," he responded that "I believe every request should be documented but I will not

tell that there have not been circumstances where an employee went to their department and put a

request in that it was accommodated, that was not documented officially."  *Id.*

## IV.   The 2018 Events

On or about November 19, 2018, a notice was generated indicating that there was a

respirator class to be held on November 30, 2018.  Dkt. No. 47 ¶ 48.  The notice indicated that

the purpose of the class was for employees to be fitted and refitted for respirator masks.  *Id.* ¶ 50.

Prior to November 30, 2018, Plaintiff was never informed that the loose-fitting respirator he was using was no longer permitted.  When Plaintiff arrived at the respirator class, he was provided with shaving cream and a razor and was instructed to shave or leave the class. Dkt. No. 40 ¶ 11; Dkt. No. 47 ¶ 54.  He explained that he wore a beard in compliance with his Muslim faith and declined to shave.  Dkt. No. 40 ¶ 12.  He was informed by the instructor that John, the General Superintendent, had stated that any construction flagger attending the respirator class must be clean shaven.  Dkt. No. 47 ¶ 54.

Plaintiff returned to his work site at 125th Street and informed his supervisor that he was removed from the class.  *Id.* ¶ 56.  He then called John and told John that he had attended the respirator class but had been unable to take the class because he was not clean shaven.  *Id.* ¶ 57.  John responded by asking Plaintiff why he went to the class without being clean shaven.  *Id.* ¶ 58.  Plaintiff replied that he went to the respirator training class every year and had approval from the Office of System Safety to be exempt from the respirator requirement as he was a practicing Muslim, unable to shave, and receiving a reasonable accommodation.  *Id.*  John stated: "I can't tell you what religion to practice, but you can't practice that there at construction flagging."  *Id.* ¶ 59.  Plaintiff was called into the crew office and informed that he was not going to be paid for that day.  *Id.* ¶ 61.  The following day, Plaintiff was placed in the role of platform conductor pending the next pick.  *Id.* ¶ 62.

After November 30, 2018, when a new pick began, Plaintiff picked construction flagging. *Id.* ¶ 64.  However, he was never called or otherwise scheduled for the respirator class.  *Id.*

## PROCEDURAL HISTORY

Plaintiff filed his complaint against Defendants on October 9, 2019.  Dkt. No. 1.  The complaint alleged eight causes of action: (1) discrimination by the corporate defendants against Plaintiff based on his perceived or actual religion in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e *et seq.*; (2) retaliation by the corporate defendants pursuant to Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; (3) discrimination under the

New York State Human Rights Law; (4) retaliation under the New York State Human Rights

Law; (5) aiding and abetting discrimination by John under the New York State Human Rights

Law; (6) discrimination under the New York City Human Rights Law; (7) retaliation under the

New York City Human Rights Law; and (8) aiding and abetting discrimination by John under the

New York City Human Rights Law.  Dkt. No. 1.

On June 19, 2021, Defendants filed their motion for summary judgment.  Dkt. No. 28.

On July 30, 2021, Plaintiff filed his memorandum of law in opposition to the motion for

summary judgment.  Dkt. No. 41.  On August 13, 2021, Defendants filed their memorandum of

law in further support of their motion for summary judgment.  Dkt. No. 46.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."
*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69) (internal citation omitted).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456,

9

466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims.

## I.    Plaintiff's Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  It further provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.* § 2000e-3(a).  "A plaintiff may claim a violation of religious discrimination under Title VII under theories of either denial of reasonable accommodation or disparate treatment."  *Goldschmidt v. N.Y.S. Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 310 (S.D.N.Y. 2005) (Chin, J.) (citing *Cosme v. Henderson*, 287 F.3d 152 (2d Cir. 2002) (denial of reasonable accommodation), and *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004) (disparate treatment)).  Plaintiff's Title VII claims fall into three categories: a religion-based disparate treatment claim; a failure-to-accommodate claim; and a retaliation claim.  The Court addresses each of these claims, and the parallel New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") claims, in turn.

### A.     Disparate Treatment

"A disparate treatment claim . . . may be established by showing either (1) adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion, or (2) harassment on the basis of religion that amounts to a hostile work environment."  *Goldschmidt*, 380 F. Supp. 2d at 310.  Plaintiff here asserts only the former.

Claims of adverse employment discrimination under Title VII are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this standard, Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment

action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for this termination. If defendant does so, the burden returns to the plaintiff to show that the real reason for [the adverse action] was his [protected status]." *Id.* at 492.

In employment discrimination cases, the burden of establishing a prima facie case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019). However, a plaintiff cannot establish a prima facie case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).

There is no dispute that Plaintiff, as a religious Muslim, is a member of a protected class. Nor do Defendants dispute that Plaintiff was qualified for his position as a construction flagger or that he suffered an adverse employment action when he was transferred from this role to the role of platform conductor. Once Plaintiff has established these elements, he must put forth evidence suggesting an inference of discriminatory motivation for that action, and if Defendants, in response, point to evidence of legitimate, nondiscriminatory reasons for those actions, he must offer evidence that those reasons were pretextual. Defendants argue that "support for the fourth factor is tenuous at best," and further argue that "even if Wilkerson manages to establish a prima facie case of discrimination based on his religion . . . he will still be wholly unable to show that Transit's stated reasons for its actions are a pretext to conceal its true reason, discriminatory animus towards members of the Muslim faith." Dkt. No. 31 at 14.

## 1.      Evidence Suggesting an Inference of Discriminatory Motivation

Plaintiff argues that "it is clear that Plaintiff's adverse action occurred under circumstances giving rise to an inference of discrimination."  Dkt. No. 41 at 8.  To support this claim, Plaintiff cites John's statement after he alerted John that he was unable to attend the respirator training:  "I can't tell you what religion to practice, but you can't practice it there at construction flagging."  *Id.* (citing Dkt. No. 42, Ex. 2 ("Wilkerson Dep.") at 93–94, 105–06).  Plaintiff also cites the temporal proximity between this incident and his removal the next day from his role as a construction flagger; he argues that "[t]he comments made by General Superintendent Ricardo John, coupled with the minimal timeframe, supports a discriminatory animus towards Plaintiff."  *Id.*  However, any inference Plaintiff seeks to draw from John's statement that the action of prohibiting Plaintiff from attending the respirator training class with a full beard—and subsequently removing him from his construction flagging post—was motivated by discrimination against Plaintiff because of his religion is undercut by Plaintiff's own testimony at his deposition:

> Q.      Do you have any reason to believe that General Superintendent John's directive that people in construction flagging must be clean shaven was directed at people of Muslim faith?
>
> A.      I have absolutely no reason to believe that General Superintendent Ricardo John put out that weekly directive, memorandum, slash, notice, whatever you want to call it, just to discriminate against Muslims.
>
> . . .
>
> Q.      I'm following the conversation with Mr. John.  Did you take any steps to seek the religious accommodation that you had previously?
>
> A.      No, I did not.

Wilkerson Dep. at 96.  Plaintiff's testimony thus contradicts any suggestion that John's statement is itself evidence supporting an inference of discriminatory motivation, since Plaintiff testified

that he has no reason to believe that John put out the directive being enforced—that people in

construction flagging had to be clean shaven—"just to discriminate against Muslims."  *See Saji*

*v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (summary order) ("[Plaintiff]

herself admitted in her deposition that she did not believe [defendant's] disciplinary action was

motivated by discrimination.  In these circumstances, the district court did not err in concluding

that [plaintiff] failed to raise a genuine dispute of material fact on this issue."); *Gold v. Titlevest*

*Agency LLC*, 2020 WL 2835570, at *8 (S.D.N.Y. June 1, 2020) ("There is simply scant evidence

that Plaintiff's termination was illegitimate.  No reasonable finder of fact could conclude that age

discrimination more likely than not played any role in Plaintiff's termination.  In her deposition

testimony, Plaintiff herself said she did not know if she believed that she was terminated because

of age discrimination and conceded that she had no evidence to support the claim that she was.").

Plaintiff further testified that he believes that people above John were discriminating

against him, but that he has no evidence to support that belief:

> Q.      Do you believe that anybody who was involved, either at system safety or
> higher up in the department of subways, was discriminating against you, based on
> your religion, with respect to the November 30, 2018, flagging incident?
>
> A.      What I believe is, that an environment was allowed to exist from people
> above me and above and [sic] general superintendent, who discriminated against
> me.  And that environment that exists enabled General Superintendent Ricardo John
> to behave in the manner in which he felt was okay.  That's what I believe.
>
> . . .
>
> Q.      Can I ask you, Mr. Wilkerson, if you have any specific evidence of that as
> opposed to, you know, how you feel?
>
> A.      No.  Everyone has been so nice to me since that incident.

Wilkerson Dep. at 133–34.  Plaintiff's belief that he was discriminated against is insufficient to

support the inference of discriminatory motivation.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d

Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely

conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Baptiste v. Cushman & Wakefield*, 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff's mere subjective belief she was discriminated against because of her [protected characteristic], oft-expressed in her deposition testimony on the subject, cannot sustain a charge of race discrimination." (citing *Holt v. KMI-Cont'l*, 95 F.3d 123, 129 (2d Cir. 1996))); *Little v. State of N.Y.*, 1998 WL 306545, at *6 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."), *aff'd*, 173 F.3d 845 (2d Cir. 1999).

The only evidence Plaintiff proffers, then, that can support the inference of discrimination is the temporal proximity between when he was told that he cannot attend the respirator training class if he does not shave and when, the following day, he was transferred from his construction flagging position to the position of platform conductor.  The Court assumes, without deciding, that this is sufficient to meet Plaintiff's de minimis burden at the prima facie stage, *see Lenzi v. Systemax*, 944 F.3d 97, 108 (2d Cir. 2019) (stating that, where plaintiff "relies on . . . temporal proximity . . . to establish an inference of unlawful discrimination," the "sequence of events in this case is sufficient to raise the inference of discrimination necessary for [plaintiff] to carry her de minimis burden to establish a prima facie case"); however, Plaintiff's claim falters at the next step.

### 2.      Evidence of Legitimate Nondiscriminatory Reasons for the Action

Assuming that Plaintiff's evidence of temporal proximity is sufficient to make out a prima facie case of religious discrimination, his claims still falter at the next step.  The record reflects significant evidence of a legitimate, nondiscriminatory reason for the respirator policy

and for its enforcement, and Plaintiff has not proffered any evidence based on which a reasonable jury could find that these reasons were pretextual.

The policy mandating that construction flaggers wear respirators originated in 2014, in response to Transit's purchase of diesel-engine locomotives that emitted toxic gases, including nitrogen dioxide.  Dkt. No. 30 ¶ 6.  To address the safety risks this posed and in response to complaints from Department of Subways' personnel and a concern expressed by the New York State Department of Labor, Transit's Office of System Safety conducted assessments of the exposure.  *Id.* ¶ 7.  It issued a report stating that the overexposure to nitrogen dioxide required that affected workers "must utilize respiratory protection" pursuant to Transit's Respiratory Protection Program.  Dkt. No. 43 ¶ 17.  The report mandated use of a specific respirator and cartridge:

> All New York City Transit personnel assigned to work in underwater tubes involving the use of R156 Diesel Locomotives must be included in the NYC Transit's Respiratory Protection Program.  Survivair half-face negative pressure air purifying respirators with S-Series combination P100/multi-contaminant cartridges are required for use.

*Id.*

In 2016, 2017, and 2018, Transit issued advisories instructing employees that "[a] tight-fitted negative pressure respirator is the only respirator that is approved for diesel exhaust protection" and that use of the respirator requires the employees to be clean-shaven because "facial hair compromises the seal of the respirator to the face."  *Id.* ¶ 20 (citing Dkt. No. 30 ¶¶ 9–11).  This requirement was in accordance with Occupational Safety and Health Administration ("OSHA") standards, which the commissioner of the New York State Department of Labor is directed by New York Labor Law to adopt, and with which public employers such as Transit are required to comply.  Dkt. No. 31 at 7–8.  As such, Defendants have a clear legitimate and nondiscriminatory reason for enforcing the respirator policy: ensuring the safety of their

16

employees from toxic gases such as nitrogen dioxide and complying with OSHA standards in doing so.

In response, Plaintiff states that "Defendants' basis for removing Plaintiff from the role of construction flagger was an obvious pretext for prohibited discrimination." Dkt. No. 41 at 10. But Plaintiff cites only the same evidence that he proffered in favor of inferring a discriminatory motive—that he was removed from the 2018 class after he refused to shave; that when he told John what happened, John responded, "I can't tell you what religion to practice, but you can't practice it there at construction flagging"; and that the next day, he was removed from his role as a construction flagger and that this action was "swift and immediate without warning." *Id.* None of this evidence supports a finding that Transit's reasons for adopting the policy in 2014 or for enforcing it in 2018 were pretextual. As discussed above, John's comment cannot support a finding that his stated reasons for his actions—to enforce the policy, as he was directed to—were a pretext for discrimination against Plaintiff because of his religion, because Plaintiff himself testified at his deposition that he did not believe John's actions in putting out the directive regarding the existing policy were directed at Muslims. Moreover, that Plaintiff was removed from the class because he refused to comply with the policy and that he was subsequently transferred to a different position that did not require him to be clean shaven, to wear a respirator, or to be respirator qualified, are wholly consistent with the stated reasons for the policy. Last, the fact that the policy was not enforced in previous years cannot support a finding that the decision to begin enforcing it was pretextual. *See Bey v. City of New York*, 999 F.3d 157, 170–71 (2d Cir. 2021) ("Nor can we agree with the [plaintiffs] that [defendant's] failure to consistently enforce the respiratory-protection standard means that complying with the regulation is not a business necessity."). At his deposition, John testified that part of the reason he was

brought in as General Superintendent of construction flagging was to enforce the safety

standards:

> One of the reasons I came back – I was brought back to construction flagging was
> one, based on my experience, and that the previous management in construction
> flagging between 2016 and 2018, did not – were not enforcing the rules properly.
> So when I came back in 2018, it was brought to my attention, that there were
> approximately 33 percent of the employees out of 700 flaggers, that were not
> wearing respirators.  So I was empowered or enforced – I was directed, sorry, to
> make sure that everyone was properly trained in respirator qualification.

Dkt. No. 42, Ex. 3, at 36.  There is no reason from the record—nor has Plaintiff pointed to any

reason—to infer that the renewed effort to enforce safety standards for all employees was a

pretext for religious discrimination.  As such, Plaintiff has not proffered any evidence to suggest

that Defendants' asserted reason for his transfer was pretextual, and his Title VII discrimination

claim thus cannot survive summary judgment.

### 3.    Discrimination Claims under NYSHRL and NYCHRL

"Claims under both Title VII and the NYSHRL . . . are generally treated as 'analytically

identical,' and are addressed together."  *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp.

3d 309, 323 (S.D.N.Y. 2020) (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir.

2019)).  As such, Plaintiff's NYSHRL adverse employment discrimination claim fails for the

same reasons his Title VII adverse discrimination claim fails.

"Courts must analyze NYCHRL claims separately and independently from any federal

and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to

the extent that such a construction is reasonably possible.'"  *Ya-Chen Chen v. City Univ. of New

York*, 805 F.3d 59, 75 (2d Cir. 2015) (quoting *Mihalek v. Credit Agricole Cheuvreux N. Am.,

Inc.*, 715 F.3d 109, 109 (2d Cir. 2013)).  However, even under this broad analysis, "the plaintiff

must establish a prima facie case, and the defendant then has the opportunity to offer legitimate

reasons for its actions.  If the defendant satisfies that burden, summary judgment is appropriate if

no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the

defendant's stated reasons were not its sole basis for taking action, and that its conduct was

based at least in part on discrimination." *Id.* at 76 (internal quotation marks omitted); *see also*

*Williams v. Regus Management Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011) (noting

that "for both discrimination and retaliation claims under the NYCHRL, courts continue to apply

the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell*

*Douglas Corp. v. Green*").  While "claims under the NYCHRL are more liberally construed than

claims under Title VII . . . , the NYCHRL does not alter the kind, quality, or nature of evidence

that is necessary to support or defeat a motion for summary judgment under Rule 56." *Williams*,

836 F. Supp. 2d at 170–71 (internal quotation marks omitted).  Even under the broader

NYCHRL standard, Plaintiff still lacks any evidence to rebut Defendants' evidence of a

legitimate, nondiscriminatory reason for their actions or to suggest pretext.  *See Moore v.*

*Metropolitan Transp. Auth.*, 999 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2013) (granting summary

judgment on a NYCHRL claim where "the evidence . . . does not meet Plaintiff's burden to show

that the [actions] were based in part on discrimination.").

> ### B.   Failure to Accommodate

Plaintiff's Title VII discrimination claims can also be construed as failure-to-

accommodate claims.  Under Title VII, "it is 'an unlawful employment practice . . . for an

employer not to make reasonable accommodations, short of undue hardship, for the religious

practices of his employees and prospective employees.'"  *Baker v. The Home Depot*, 445 F.3d

541, 546 (2d Cir. 2006) (quoting *Trans World Airlines Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).

In other words, "when an employee has a genuine religious practice that conflicts with a

requirement of employment, his or her employer, once notified, must offer the aggrieved

employee a reasonable accommodation, unless doing so would cause the employer to suffer

undue hardship." *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). "In formulating such an accommodation, both the employer and employee should remain flexible, with an eye toward achieving a mutually acceptable adjustment. Nevertheless, to avoid Title VII liability, the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." *Id.* "[E]mployees are not entitled to hold out for the 'most beneficial accommodation,' and . . . '[o]rdinarily, questions of reasonableness are best left to the fact finder." *Baker*, 445 F.3d at 548 (second alteration in original) (first quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986), and then quoting *EEOC v. Univ. Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990)). However, "an offer of accommodation may be *unreasonable* 'if it causes an employee to suffer an inexplicable diminution in his employee status or benefits. In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification, such as the neutral operation of a seniority system."" *Id.* (alterations omitted) (quoting *Cosme*, 287 F.3d at 160).

To make out a prima facie case of a religious discrimination failure-to-accommodate claim, plaintiffs "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546 (quoting *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)). "Assuming a plaintiff can establish a prima facie case, 'where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." *Jeffrey v. Montefiore Med. Ctr.*, 2013 WL 5434635, at *16 (S.D.N.Y. Sept. 27, 2013) (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1968)). If the employer has not done so,

"the burden shifts to the employer to show that it cannot reasonably accommodate the plaintiff without undue hardship on the employer's business."  *Siddiqi v. New York City Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)).

Defendants do not contest that Plaintiff has made out a prima facie failure-to-accommodate claim.  Rather, they argue that transferring him to another position that did not conflict with his religious beliefs was a reasonable accommodation and further argue that other accommodations would impose an undue hardship on them and conflict with their mandatory safety regulations.

With regard to the former, Defendants argue that despite the fact that Plaintiff was transferred to a position with a lower hourly salary, fewer overtime opportunities, and without the possibility of promotion to lead flagger, this was a reasonable accommodation under the circumstances:

> Accepting all of that as true, Wilkerson has not suggested that he was trained and eligible to work in a position outside the conductor's title that would have provided pay and opportunities comparable to construction flagging.  Wilkerson had a choice of modifying his religious practices, looking for work outside of Transit or taking the position of platform conductor.  As there was nothing else that Transit could offer to Wilkerson, the reduction in pay and overtime hours may have been disappointing to Wilkerson but it was not unreasonable in the circumstances.

Dkt. No. 31 at 13.  Because the transfer was accompanied by "diminution in [Plaintiff's] employee status or benefits," *Baker*, 445 F.3d at 548, whether or not it represented a reasonable accommodation turns on whether this diminution was "inexplicable" or "without justification," *id*.  Defendants argue that there was no alternative accommodation they could have offered that would have maintained Plaintiff's benefits and employment status, but they do not cite any support in the record for that assertion.  There is no evidence indicating that Defendants attempted to find an alternative accommodation that would not have had these adverse effects on

21

Plaintiff's employment; the record reflects that Plaintiff was transferred almost immediately after the conflict between his religious beliefs and his position was brought to John's attention. As such, the evidence does not support a finding that this accommodation was reasonable as a matter of law.

Because Defendants have not demonstrated that they offered Plaintiff a reasonable accommodation, "the burden shifts to [Defendants] to show that [they] cannot reasonably accommodate the plaintiff without undue hardship on [their] business." *Siddiqi*, 572 F. Supp. 2d at 370. Defendants argue that any accommodation within construction flagging would cause them undue hardship, because it would require them to disregard mandatory OSHA regulations. Relying on *Bey v. City of New York*, they argue that the Second Circuit has held that "employer's compliance with the [OSHA respirator] standard defeats a failure-to-accommodate claim." Dkt. No. 31 at 8. In *Bey*, the Second Circuit considered an Americans with Disabilities Act ("ADA") failure-to-accommodate claim brought by a group of men employed with the New York City Fire Department who could not shave for medical reasons but were required to be clean shaven to wear the respirators needed to do their jobs. 999 F.3d at 161. The Second Circuit held that "[a]n accommodation is not reasonable with the meaning of the ADA if it is specifically prohibited by a binding safety regulation promulgated by a federal agency. Whether that is because the illegality of the accommodation presents an 'undue hardship' as the FDNY suggests, or existence of the federal regulation is itself an affirmative defense, makes little difference." *Id.* at 168. Under the same analysis, any accommodation that would entail utilizing a respirator without shaving would not be reasonable here.

However, *Bey* does not address another potential accommodation that Plaintiff advocates for here—allowing Plaintiff to remain in construction flagging but work on projects that did not

require a respirator.  In fact, in *Bey* the plaintiffs were offered an alternative accommodation in which they would not be required to shave but would be placed on "light duty," a position in which their titles, salaries, and benefits would not change but they would not be required to fight fires, the only task that requires wearing a respirator.  999 F.3d at 162.  Defendants argue that projects that do not require wearing a respirator "comprise a minority of the capital construction projects."  Dkt. No. 31 at 12.  At deposition, however, Franceschini testified that with regard to capital projects, "[a] large part of that work, not the majority of that work, was requiring respirator use because of the work in tunnels."  Franceschini Dep. at 52.  Plaintiff testified at his deposition that the majority of diesel engines do not emit toxic fumes, and that the practice of construction flaggers when they encounter one of the engines that does emit such fumes is simply to "move away from that, until they can get that type of equipment out of the area."  Wilkerson Dep. at 70–71.  Defendants argue that accommodating Plaintiff's religious beliefs by allowing him to remain in construction flagging but only work jobs that do not require the use of a respirator "would require Transit to hire an additional construction flagger to cover the job assignments that Wilkerson sits out, or shift the burden to [another] flagger."  Dkt. No. 31 at 12.  But Defendants adduce no evidence as to how frequently Plaintiff—or any other construction flagger—actually encounters a situation in which they would require a respirator.  Plaintiff's testimony is that this happened rarely, if at all.  On this record, there remains a triable issue of fact as to whether such an accommodation would in fact cause Transit undue hardship.[1]

---

[1] Defendants also argue that this accommodation would impose undue hardship because "capital construction projects do not proceed on a fixed and dependable schedule that can be known with certainty far in advance."  Dkt. No. 31 at 11.  They argue that "[m]yriad unpredictable circumstances may require a suspension of work on an above-ground project at the last moment and the reassignment of the construction flaggers on that project to one that is in the tunnels or an underground station."  *Id.*  They claim that Plaintiff "himself confirmed that last-minute changes in the allocation of personnel to construction sites . . . were to be expected," *id.*, but the

C.      Retaliation

Plaintiff's retaliation claim is predicated on the same allegations as his employment discrimination claim, and it suffers from the same evidentiary defects.

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden shifting framework.  *Smith v. N.Y.C.*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019).  In order to establish a prima facie case of Title VII retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  As in the discrimination context, "[t]he plaintiff's burden of proof as to this first step has been characterized as "minimal" and "*de minimis*.'"  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute*, 420 F.3d at 173).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173.

---

testimony they cite does not completely align with their characterization:

> Q.      You pick into construction flagging, but that's no guarantee as to where you'll be assigned or what shift you'll work of what your RDOs will be?
> A.      Right.
> Q.      So you can pick up a p.m. shift for construction flagging and discover that you're going to be working at 12 noon?
> A.      Yes.
> Q.      Was that a yes?
> A.      That's happened to me many times.

*Id.* (citing Wilkerson Dep. at 44–45, 47–48).  Plaintiff's testimony is thus that in construction flagging, there is no guarantee that you will get the specific times or jobs you request, but Plaintiff does not testify that these changes frequently occur last minute, or that they frequently—if at all—entail switches from a position where a respirator would not be required to a position that would require a respirator.  This, too, presents a triable question of fact.

Plaintiff's retaliation claim does not allege that Defendants took adverse actions against him as a result of his protected activity in filing grievances or filing this lawsuit.  Rather, Plaintiff seeks to reframe the same series of incidents—his showing up at the 2018 respirator class, being asked to shave, refusing to do so because of his religion, and subsequently being transferred out of construction flagging—as retaliation for the protected activity of requesting a reasonable accommodation for his religious beliefs.[2]  His claim falters on the causation element.

Title VII retaliation claims require that a plaintiff "establish that his or her protected activity was a but-for cause of the alleged action by the employer," and not merely a "substantial" or "motivating" factor, which is sufficient for a discrimination claim.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 348 (2013).  At the prima facie stage, a plaintiff may show causation either indirectly, "by showing that the protected activity was closely followed in time by the adverse action," *Kwan*, 737 F.3d at 845 (quoting *Gorman-Baker v. Cornell Coop.*

---

[2] Plaintiff's brief also argues that that he testified during his deposition to "further acts of retaliation he has faced in the hands of Defendants":  "I believe that pick flagging, the very next pick, and I believe that the crew office did not crew me up for flagging.  I believe that I wasn't scheduled for training.  I believe that I wasn't scheduled for my respirator class.  I also believe that I was passed over as an assistant train dispatcher because of my case."  Dkt. No. 41 at 25 (quoting Wilkerson Dep. at 136–37).  However, these additional allegations appear nowhere in Plaintiff's complaint, nor does Plaintiff proffer any additional evidence beyond his own testimony to support these beliefs.  Plaintiff's deposition testimony is itself uncertain as to whether or not he was passed over for the assistant train dispatcher position:

> Q.     When was the assistant train dispatcher position filled?
> A.     Well, I'm sure they passed my number by now, but . . .
> Q.     Do you know –
> A.     I'm on the list.  I should have been called.
> Q.     Well, do you know for a fact that your number on the list has been reached?
> A.     How do we know?  I really don't know.  I really don't know, sir.
> Q.     Who is the one that makes the decision on hiring off the list versus train dispatch?
> A.     I really don't know.
> Q.     Would it be anyone in construction flagging?
> A.     I really don't know.

Wilkerson Dep. at 17–18.

*Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)), or directly, "through evidence of retaliatory animus directed against the plaintiff by the defendant," *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). If the employer carries that burden, then the burden shifts back to the plaintiff, who must establish "that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.*; *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture. For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.").

Plaintiff can rely on the temporal proximity between his request for a religious accommodation and his transfer from his position in construction flagging to support an inference that this action was retaliatory and make out a prima facie case of retaliation.[3] However, Defendants, as above, have a legitimate, nondiscriminatory explanation for the action—it was simply the enforcement of a neutral respirator policy designed to protect the safety of Transit employees, coupled with OSHA guidelines about facial hair and mask use.

---

[3] Plaintiff's argument that Defendants' statement that "[e]xplaining that he wears a beard in compliance with his Muslim faith, Wilkerson declined to shave and, ***as a consequence***, was transferred from construction flagging to an assignment as a platform conductor" is "considered [an] admission[] to retaliatory conduct," Dkt. No. 41 at 23 (emphasis in original), places more weight on the phrase "as a consequence" than it can bear. This statement does not suggest that Plaintiff was transferred as a punishment for declining to shave but rather conveys that he was transferred from a position in which he would be required to shave because he declined to do so.

Plaintiff has proffered no evidence to suggest that this reason was a pretext for retaliation against Plaintiff for requesting an accommodation or asserting his religious beliefs.  Instead, Plaintiff argues that "Defendants have failed to articulate a non-discriminatory reason to justify the retaliatory actions suffered by Plaintiff."  Dkt. No. 41 at 24.  Plaintiff proffers no additional evidence beyond the temporal proximity and the evidence discussed above in context of his discrimination claim to suggest that the safety reasons for the mask policy and its enforcement were pretextual.  As such, he has not carried his burden under the *McDonnell Douglas* framework to make out a retaliation claim that can survive summary judgment.

1.        **Retaliation Claims under NYSHRL and NYCHRL**

Plaintiff also brings retaliation claims under NYSHRL and NYCHRL.  The standard for a retaliation claim under New York state law is the same as the standard under Title VII, *see Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (summary order); as such, Plaintiff's NYSHRL retaliation claim fails for the same reason as his Title VII claim fails.  As with discrimination claims, retaliation claims under the NYCHRL are "broader than Title VII's," and "protect[] plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'"  *Ya-Chen Chen*, 805 F.3d at 76 (quoting *Mihalik*, 715 F.3d at 112).  NYCHRL retaliation claims are also "evaluated under the familiar *McDonnell Douglas* three-step burden-shifting framework."  *Marseille*, 2021 WL 3475621, at *11 (citing *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2016)).  Thus, even under the NYCHRL's broader framework, a retaliation claim still hinges on a causal element between the protected activity and the alleged retaliatory conduct.  As such, Plaintiff's NYCHRL retaliation claim suffers from the same defect as Plaintiff's Title VII retaliation claim—Plaintiff has proffered no evidence that would allow a reasonable jury to find that Defendants' actions were retaliatory.

**II.**   **Aiding and Abetting Discrimination and Retaliation Under NYCHRL and NYSHRL**

Plaintiff also brings claims of aiding and abetting discrimination and retaliation under NYCHRL and NYSHRL against Defendant John.  "Aiding and abetting is only a viable theory where an underlying violation has taken place." *Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009).  "Thus, because Plaintiff's . . . retaliation claims 'fail on their merits, his aiding and abetting claims fail as well.'"  *Harge v. City of New York*, 2021 WL 3855305, at \*20 (S.D.N.Y. Aug. 26, 2021) (alterations omitted) (quoting *Falchenberg*, 338 F. App'x at 14); *see also Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018) ("Since there is no underlying NYSHRL or NYCHRL violation, there was no aiding or abetting of acts forbidden by the NYSHRL and NYCHRL." (citing *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004))).  Because Plaintiff's failure-to-accommodate claim survives summary judgment, any claim for aiding and abetting discrimination by failing to provide a reasonable accommodation survives as well.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 28.


SO ORDERED.

Dated: December 3, 2021
       New York, New York
                                           LEWIS J. LIMAN
                                        United States District Judge